Carolyn PATRICK and Dorothy Nilan, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

Ray MARSHALL, Secretary of Labor, Edward J. Bacciocco, Jr., Fred Lyon, John M. Ward, William H. Royer, and James V. Fitzgerald, in their official capacities as members of the Board of Supervisors of San Mateo County, Defendants,

American Federation of State, County and Municipal Employees, AFL–CIO, and Local 829 AFSCME, AFL–CIO, CLC, Defendants in Intervention.

No. C–78–1414 WHO.

United States District Court, N. D. California.

Aug. 7, 1978.

Ann Broadwell, Thomas R. Adams, Legal Aid Society of San Mateo County, Daly City, Cal., for plaintiffs.

G. William Hunter, U. S. Atty., William T. McGivern, Jr., Asst. U. S. Atty., San Francisco, Cal., for federal defendants; Daniel W. Teehan, Regional Sol., Jonathan H. Waxman, Counsel for Lit., Washington, D. C., Gennaro J. lngenito, Atty., San Francisco, Cal., Edward N. Perry, Atty., U. S. Dept. of Labor, Washington, D. C., of counsel.

Keith C. Sorenson, Dist. Atty., County of San Mateo, Thomas F. Casey, III, Asst. Dist. Atty., Redwood City, Cal., for defendants Edward J. Bacciocco, Jr., Fred Lyon, John M. Ward, William H. Royer and James V. Fitzgerald.

Zwerdling & Maurer, Wendy L. Kahn, Washington, D. C., Irwin Leff, Rosenthal & Leff, Inc., San Francisco, Cal., for intervenors.

## OPINION

ORRICK, District Judge.

Plaintiffs, who are employees hired under the Comprehensive Employment and Training Act ("CETA workers") by the County of San Mateo, California ("San Mateo"), bring this class action to enjoin defendant San Mateo from terminating their employment and to obtain declaratory relief concerning certain regulations issued by the defendant Secretary of Labor ("the Secretary"). These regulations provide that CETA workers may not be hired when any other person is on layoff from the same or any substantially equivalent job and further provide that, if layoffs of regular employees occur during the grant period, CETA workers or participants may not remain working in the same or substantially equivalent jobs with the employing agency that is affected by the layoff. 29 C.F.R. §§ 96.24(d) and 99.34(d).[1]

For the reasons hereinafter stated, the Court certifies the class, denies injunctive relief, and dismisses the action, holding that the regulations of the Secretary challenged by the plaintiffs are valid and in conformity with the Comprehensive Employment and Training Act ("CETA"), 29 U.S.C. §§ 801–892.

### I.

Congress enacted CETA in 1973[2] for the general purpose of providing "job training and employment opportunities for economically disadvantaged, unemployed, and underemployed persons, and to assure that training and other services lead to maximum employment opportunities and enhance self-sufficiency by establishing a flexible and decentralized system of Federal, State, and local programs." 29 U.S.C. § 801. CETA authorizes grants for Comprehensive Manpower Service, including vocational, educational training, work experience, and public service employment. Titles II and VI of the Act dealing with public service employment were enacted "to provide unemployed and underemployed persons with transitional employment in jobs providing needed public services in areas qualifying for assistance and, wherever feasible, related training and manpower services to enable such persons to move into employment or training not supported under this subchapter." 29 U.S.C. §§ 841, 962.

Thus, CETA makes it possible for local governmental units such as the County of San Mateo to receive grants from the Secretary of Labor and to expend such grants within their respective jurisdictions in the manner best suited to solve the peculiar problems of their particular local labor market. To obtain the grants the local governmental units, sometimes known as "prime sponsors," must meet certain qualifications and must make application to the Secretary describing the proposed public service employment program in detail and must meet certain conditions laid down in the statute,

---

1. A hearing on a motion for a temporary restraining order, set for June 28, 1978, was continued to June 29, 1978, at which time a temporary restraining order against defendants was issued on an order to show cause why the defendants should not be restrained from terminating or enforcing the termination of the employment of plaintiffs solely because regular employees have been terminated for bona fide reasons during the pendency of this action. On July 10, 1978, all counsel stipulated to an extension of the temporary restraining order until

July 20, 1978, at 10:00 a. m. At the hearing on July 10, the Court granted motions of the American Federation of State, County and Municipal Employees, AFL–CIO, and of Local 829, AFSCME, AFL–CIO, CLC to intervene. Pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure the Court ordered the trial of this action on the merits advanced and consolidated with the application for the injunction.

2. CETA has been amended three times—December, 1974, October, 1976, and August, 1977.

including requirements for maintenance of effort and provisions to insure that the jobs of regular government employees will not be lost or reduced, thus assuring that grant funds will be used to create new job opportunities. Among the assurances that the prime sponsor must give to the Secretary are:

"(7) assurances that special consideration in filling transitional public service jobs will be given to unemployed persons who are the most severely disadvantaged in terms of the length of time they have been unemployed and their prospects for finding employment without assistance under this title, but such special consideration shall not authorize the hiring of any person when any other person is on lay-off from the same or any substantially equivalent job;

(8) assurances that no funds received under this subchapter will be used to hire any person to fill a job opening created by the action of an employer in laying off or terminating the employment of any regular employee not supported under this subchapter in anticipation of filling the vacancy so created by hiring an employee to be supported under this subchapter;

\* \* \* \* \* \*

(24) assurances that the jobs in each promotional line in no way infringe upon the promotional opportunities which would otherwise be available to persons currently employed in public service jobs not subsidized under this subchapter, and assurances that no job will be filled in other than an entry level position in each promotional line until applicable personnel procedures and collective bargaining agreements have been complied with;

(25) assurances that jobs funded under this subchapter are in addition to those that would be funded by the sponsor in the absence of assistance under this chapter;" 29 U.S.C. § 845(c)(7), (8), (24), (25).

No application may be approved by the Secretary unless he determines that:

"(1) the program (A) will result in an increase in employment opportunities over those opportunities which would otherwise be available, (B) will not result in the displacement of currently employed workers (including partial displacement such as a reduction in the hours of non-overtime work or wages or employment benefits) \* \* \*." 29 U.S.C. § 848(a)(1).

To implement the purposes of the statute, the Secretary adopted regulations, including the challenged regulations set out in 29 C.F.R. §§ 96.24(d) and 99.34(d), which read as follows:

"(d) These regulations do not authorize the hiring of any person when any other person is on lay-off from the same or any substantially equivalent job (sec. 205(c)(7)(8)). If lay-offs of regular employees occur during the grant period, participants may not remain working in the same or substantially equivalent job within the employing agency that is affected by the lay-off. Under these circumstances, the participants would either be transferred to positions not affected or be laid off or terminated. Prime sponsors shall try to transfer CETA participants to nonaffected positions, transfer them to Title I, if appropriate, or attempt to place them into unsubsidized employment before laying them off or terminating them (sec. 205(c)(8))." 29 C.F.R. § 96.24(d).

"(d) No prime sponsor shall hire or allow the hiring of any person into any job funded under this part when any other person is on lay-off from the same or any substantially equivalent job (secs. 602(c), 205(c)(7)(8)). If layoffs of regular employees occur during the grant period, participants may not remain working in the same or substantially equivalent job within the employing agency that is affected by the lay-off. Such participants shall be transferred to positions not affected or be laid off or terminated. Prime sponsors shall try to transfer them to Title I, if appropriate, or shall attempt to place them into unsubsidized employment before laying them off or terminating them (secs. 602(c), 205(c)(7)(8))." 29 C.F.R. § 99.34(d).

These regulations require that whenever a public employee is laid off, all CETA workers in the same or substantially equivalent jobs must be transferred, laid off, or terminated.

On June 6, 1978, the voters, by passing Proposition 13, amended the California Constitution by adding Article 13A, substantially reducing property tax revenue available to local governmental units. The amendment became effective by its terms July 1, 1978, and most, if not all, local government units in California have been forced to cut drastically their respective budgets.

In the case of San Mateo, its net 1978–1979 revenue loss as a result of Proposition 13, and after taking into account funds appropriated to it by the State of California, is estimated at $20,123,000. The Board of Supervisors has found it necessary to lay off 220 regular workers, and an additional 56 employees having bumping rights have been given notices of lay-off. Under the Secretary's regulations above-described, the County is required to transfer, lay off, or terminate all CETA workers in the same or similar job classifications as the regular workers. As a result, between 39 and 63 CETA workers, including plaintiffs herein, have been given termination notices by San Mateo.

Plaintiffs seek an injunction against San Mateo as well as the Secretary from terminating the employment of or laying off of any CETA employees employed under Title II or Title VI of CETA solely because the regular public employees have been terminated or laid off for bona fide budgetary reasons. They also seek a determination by the Court that the Secretary's regulations pursuant to which San Mateo acted are overbroad and, therefore, invalid and not authorized by CETA.

## II.

■ Plaintiff has moved the Court to certify a class composed of persons (1) who are presently employed, or (2) who will in the future be employed by San Mateo under Title II and Title VI of CETA, and (3) who have been or will be terminated from their jobs pursuant to 29 C.F.R. §§ 96.24(d) or 99.34(d).

Rule 23(c)(1) of the Federal Rules of Civil Procedure requires the Court as soon as practicable upon commencement of an action brought as a class action to determine by order whether it is to be so maintained. The first requirement, of course, is that a class must exist. In this case it appears that there is indeed a class. All class members could lose their jobs if the above-mentioned regulation is upheld, and all persons in the class are being laid off because of the layoffs of regular employees for budgetary reasons. Second, Rule 23(a)(1) provides that the class must be "so numerous that joinder of all members is impracticable." Various courts have taken different approaches to this so-called requirement of numerosity. In general, it has been held that joinder is practicable where there are less than 25 parties, and impracticable when there are more than 35. See C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1762 at 596–99 (1972). In the case at bar there are at least 39 potential class members and possibly more. Thus, the numerosity requirement has been met. The third requirement is that there must be questions of law or fact common to all members of the class. Here, the claims of the class members stem from a single event, namely, the layoffs of regular employees for budgetary reasons. The plaintiffs are all challenging the same two regulations. Hence, there are common questions of law or fact, and the claims are typical. The next requirement is set out in Rule 23(a)(4): the class representative must "fairly and adequately protect the interests of the class." Here, the plaintiffs have effective counsel, experienced in this type of action. In addition to meeting the prerequisites of Rule 23(a), a class representative must demonstrate that the proposed class action fits into one of the three subdivisions of Rule 23(b). Rule 23(b)(2) provides for a class where the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corre-

sponding declaratory relief with respect to the class as a whole. That is precisely the situation in the case at bar, and the above-described class is, accordingly, certified as a Rule 23(b)(2) class.

## III.

■ At the heart of the controversy is the question whether the so-called "maintenance of effort" regulations—the challenged regulations—29 C.F.R. §§ 96.24(d) and 99.34(d), are overbroad and inconsistent with the statute. These regulations prohibit CETA workers from remaining in the same or similar jobs as laid-off regular workers, regardless of the reasons for the layoff. Plaintiffs point to passages in the legislative history which they claim show that Congress did not intend that the labor protection provisions of CETA, 29 U.S.C. §§ 845(c)(7) and (c)(8), should prevent local government entities from rehiring laid-off public employees as CETA workers. If a government employee loses his or her job as a result of a bona fide layoff, then this employee can be rehired as a CETA worker. However, if said employee loses his or her job as a result of a "sham" or "paper" layoff—that is, where the only reason for the layoff is the government entity's desire to substitute CETA workers for the workers who would otherwise be on the government payroll—then said employee may not be rehired as a CETA worker. The most concise expression of this intent is set out below:

"The Conference Report accompanying the enactment of Title VI (H.Rept. 93–1621) contained the following statement: 'The strong feeling of the conferees in opposition to 'paper-lay-offs' should in no way be construed to mean opposition to the rehiring of laid off workers per se. The rehiring of former employees who lost their jobs due to a bona fide lay-off has always been permitted and is permitted here.'" [1976] U.S.Code Cong. & Admin.News, p. 2822.

From this legislative history, plaintiffs conclude Congress intended that a distinction between bona fide layoffs and sham layoffs should also be drawn in the situation at bar; namely, where CETA workers seek to remain on the job in the face of layoffs of regular public employees.

Plaintiffs' interpretation is incorrect. There is nothing in the statute to reasonably support their position. And, as noted above, the expressions of Congressional concern over the bona fide versus sham layoff distinction were made in the context of using CETA funds to *rehire regular employees* laid off for bona fide reasons. It would stretch the legislative history much too far to say that such a distinction should also be made in the context of deciding whether a prime sponsor can use CETA funds to *retain CETA-funded employees* doing the same or substantially equivalent work as regular employees who are laid off.

Plaintiffs also argue that the challenged regulations are inconsistent with the dominant purpose of CETA of providing employment and training opportunities for the hardcore unemployed and underemployed. It is beyond cavil that the drafters of this mammoth $11 billion program saw the purpose of CETA as providing employment and training, and the purposes of Titles II and VI as providing transitional public service employment for unemployed and underemployed individuals.

However, Congress clearly did not intend that the gains of CETA workers should come at the expense of regular public workers. Accordingly, the CETA is replete with provisions preventing prime sponsors, such as San Mateo, from using CETA funds in a manner that would injure regular employees of local government. For example, a prime sponsor must give assurances that the hiring of CETA workers is not authorized when any other person on the prime sponsor's regular payroll is on layoff from the same or any substantially equivalent job. 29 U.S.C. § 845(c)(7). Prime sponsors must also agree to not stage paper layoffs. 29 U.S.C. § 845(c)(8). No federal financial assistance will be provided for any program or activity unless the Secretary determines that the program will not result in the displacement of currently employed work-

ers (including partial displacements such as a reduction in the hours of nonovertime work or wages or employment benefits) and that it will not impair existing contracts for services or result in the substitution of Federal for other funds in connection with the work that would otherwise be performed. 29 U.S.C. § 848(a)(1).

Finally, each grantee must assure the Secretary that CETA jobs will in no way infringe upon the promotional opportunities which would otherwise be available to regular employees not supported by CETA funds and that no job will be filled in other than an entry level position until applicable personnel procedures and collective bargaining agreements have been complied with. 29 U.S.C. § 845(c)(24).

Against this statutory backdrop, it must be concluded that the challenged regulations reflect and implement the Congressional concern that the rights of regular payroll employees be protected. The first sentences of 29 C.F.R. §§ 96.24(d) and 99.-34(d) simply repeat the class clause of 29 U.S.C. § 845(c)(7): the hiring with CETA funds of any person when any other person is on layoff from the same or any substantially equivalent job is *not* authorized. The second sentences of these regulations provide that if regular municipal workers are laid off, then CETA participants in the same or substantially equivalent jobs must either be transferred to nonaffected positions or be laid off also. Without these second sentences, a city or county would have the incentive to lay off more of its regular workers than would be necessary, anticipating that it could then use the retained CETA workers to perform the tasks that otherwise would have been performed by those regular workers whose lay off was not economically necessary. Similarly, to permit CETA workers to remain in the same or similar positions would discourage the city or county from rehiring at some later date the laid-off regular workers, since their functions would be performed by federally-funded employees.

The challenged regulations are a reasonable implementation of statutory policy, and

unless "there are compelling indications it is wrong," *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969), the regulations cannot be overturned. In passing, we note that Judge MacMahon of the United States District Court for the Southern District of New York in *Rivera v. City of New York*, Civ. No. 75–CV–4305–LFM (S.D.N.Y., Sept. 16, 1975), an unpublished opinion, likewise has found the regulation to be consistent with the intent of CETA.

It should be emphasized that the challenged regulations do not require San Mateo to lay off all CETA workers. The regulations give the prime sponsor five alternative courses of action: (1) the prime sponsor may transfer the CETA worker to a nonaffected position; (2) the prime sponsor may transfer the CETA worker to Title I (training) if appropriate; (3) the prime sponsor may attempt to place the CETA worker into unsubsidized employment; (4) the prime sponsor may lay off CETA participants; or (5) the prime sponsor may terminate the participant. The challenged regulations *require* the prime sponsor to make an attempt to transfer the participants before laying them off or terminating them. The only requirement of the regulation is that the CETA worker may not remain working in the same or substantially equivalent job within the employing agency.

Finally, if plaintiffs feel that they have been unlawfully discharged, they can pursue the procedures promulgated by the Secretary for the receipt, investigation, hearing, and determination of questions of noncompliance with the requirements of the Act. 29 C.F.R. §§ 98.26 and 98.40–49. A grievance may be filed and a request for a hearing concerning their employment or a prime sponsor's administration of the CETA program may be filed first with the prime sponsor and finally with the Regional Administrator of the Department of Labor. In the case at bar, no such grievances have been filed.

The Court accepts the plaintiffs' statement that to construe the Secretary's regulations as consistent with the Act will result

in at least a temporary increase in unemployment in California, and it may indeed be true, as plaintiff so dramatically points out, that "the irony of this lawsuit is that the Secretary of Labor acting under the authority of an act designed to relieve unemployment is requiring the layoffs of hundreds of employees in San Mateo County and presumably thousands of employees in the State of California," and that "the Secretary's action will not protect public employees since they must be laid off anyway."

There is merit in plaintiffs' view that Congress did not intend such a bizarre application of federal policy, but then neither Congress nor many of the people who voted for Proposition 13 envisioned the holocaust that was sure to follow. Nonetheless, Congress has spoken in the plainest of words, making it abundantly clear that the jobs given to CETA workers are conditioned upon protecting the interests of the regular workers.

To quote from Chief Justice Burger in *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978)—the so-called snail darter case—

"While '[it] is emphatically the province and duty of the judicial department to say what the law is,' *Marbury v. Madison*, 5 U.S. 137, 177 [2 L.Ed. 60] (1803), it is equally—and emphatically—the exclusive province of the Congress not only to formulate legislative policies, mandate programs and projects, but also to establish their relative priority for the Nation. Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for the Executive to administer the laws and for the courts to enforce them when enforcement is sought." *Id.* at 194, 98 S.Ct. at 2301.

He goes on:

"Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute. Once the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end. We do not sit as a committee of review, nor are we vested with the power of veto. The lines ascribed to Sir Thomas More by Robert Bolt are not without relevance here:

'The law, Roper, the law. I know what's legal, not what's right. And I'll stick to what's legal . . . . I'm *not* God. The currents and the eddies of right and wrong, which you find such plain-sailing, I can't navigate, I'm no voyager. But in the thickets of the law, oh there I'm a forester. . . . What would you do? Cut a great road through the law to get after the Devil? . . . And when the last law was down, and the Devil turned round on you—where would you hide, Roper, the laws all being flat? This country's planted thick with laws from coast to coast—Man's laws, not God's—and if you cut them down . . . d'you really think you could stand upright in the winds that would blow then? Yes, I'd give the Devil benefit of law, for my own safety's sake.' Bolt, A Man for All Seasons, Act I, at 147 (Heinemann ed. 1967)." *Id.*

This Court agrees that, again in the words of the Chief Justice, "in our constitutional system the commitment to the separation of powers is too fundamental for us to pre-empt congressional action by judicially decreeing what accords with 'commonsense and the public weal.' Our Constitution vests such responsibilities in the political Branches." *Id.*

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the foregoing constitutes findings of fact and conclusions of law.

The motion for an injunction is denied, the temporary restraining order is dissolved, and the case is dismissed.

On or before August 28, 1978, plaintiffs will prepare and lodge with the Court an order certifying the class showing both Carolyn Patrick and Dorothy Nilan as class representatives and defendants will prepare and lodge with the Court a form of judgment dismissing the action.